556    APPELLATE COURTS OF ILLINOIS.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

## Ida M. Tindall, Appellee, v. Chicago & Northwestern Railway Company, Appellant.

### Gen. No. 6,288.

1. APPEAL AND ERROR, § 810*—*what bill of exceptions must contain.* Affidavits not made a part of the bill of exceptions cannot be considered on appeal though inserted in the record by the clerk and certified by him to be on file in the case.

2. APPEAL AND ERROR, § 798*—*what bill of exceptions must contain.* Error assigned on appeal on a ruling of the trial court permitting the plaintiff to amend a count in violation of an alleged agreement not to do so, made between counsel for the parties during the trial, cannot be considered where the bill of exceptions does not show that any such agreement was made or that anything was said or done in reliance thereon.

3. APPEAL AND ERROR, § 842*—*when certificate of trial judge as to facts in affidavit necessary.* Though an affidavit as to what occurred in open court during the trial of a case be embodied in the bill of exceptions on appeal as part of the showing made upon a motion for a new trial, it cannot be considered on appeal unless the facts as therein stated are vouched for by the certificate of the trial judge.

4. APPEAL AND ERROR, § 838*—*how trial judge may refresh recollection for purpose of certifying to bill of exceptions.* If a trial judge does not remember what occurred in the trial of a case before him he may, for the purpose of refreshing his recollection, have the notes of the reporter read to him, or call witnesses or jurors to testify, or receive affidavits as to such matters in order to enable him to properly certify to the bill of exceptions.

5. APPEAL AND ERROR, § 1339*—*what presumed on review of ruling denying motion for new trial.* If after the filing of an affidavit, as to matters occurring at the trial of a case, as part of the showing upon which a motion for a new trial is based, the judge denies the motion, it will be presumed, on reviewing such ruling, that he knew the statements in the affidavit were untrue, or that their effect was obviated by other things which to his knowledge occurred on such trial.

6. NEW TRIAL, § 61*—*when not granted on ground of surprise.* Where on appeal a defendant claimed that, as a result of the trial court permitting the plaintiff to amend a count in her declaration, he was taken by surprise, but it appeared that he had made no

---

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

request to the trial court for time to secure other witnesses nor asked for a continuance, and the matter set out in the amended count had already been thoroughly gone into, and an affidavit relied upon as the basis for a motion for a new trial did not state that the defendant had found any witnesses whom it would or could have produced had the amendment been made sooner, nor name any witnesses whom it could produce if a new trial were granted, and the amendment was but an enlargement of that which was sufficiently stated in the count before it was amended, *held* the allowance of such amendment and the denial of a new trial were not error.

7. DAMAGES, § 112*—*when verdict for personal injuries to woman not excessive*. A verdict of $7,000 awarded a female art demonstrator, forty-eight years old, earning $140 per month, her traveling and hotel expenses being allowed her, for injuries consisting principally of partial ankylosis of the right shoulder, which prevented her from following her occupation, *held* not excessive.

8. CARRIERS, § 476*—*when evidence insufficient to show that passenger was habitual litigant*. Evidence in an action for personal injuries against a railroad company, *held* not to show that the plaintiff was engaged in the business of being injured on railways.

9. EVIDENCE, § 148*—*when exhibition of injured member not error*. On the trial of an action for personal injuries, consisting in part of partial ankylosis of the shoulder, *held* that allowing the witness to hold up her arm to demonstrate the extent to which freedom of movement had been impaired was not error.

10. APPEAL AND ERROR, § 1625*—*when error in sustaining objection to admission of evidence cured*. Objection to a question addressed to a physician, who had treated the plaintiff in a personal injury action, as to how much he charged her, *held* improperly sustained where followed by a question as to whether the amount charged was the usual and customary charge for such service.

11. TRIAL, § 91*—*when necessary that objections to evidence be specific*. A general objection to a nonresponsive answer is not a sufficient basis on which to assign as error the overruling thereof, as the nonresponsiveness of the answer should be specifically pointed out.

12. APPEAL AND ERROR, § 1625*—*how error in improperly sustaining objection to question cured*. Allowing a nonresponsive answer, not properly objected to, which was responsive to a prior question, objection to which was improperly sustained to stand, *held* equivalent to a change of the ruling sustaining such objection and to cure the error therein.

13. APPEAL AND ERROR, § 1712*—*when errors not argued in brief

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

558    APPELLATE COURTS OF ILLINOIS..

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

*waived.* Errors in the record not argued in the opening brief on appeal are thereby waived and cannot be availed of by the appellant.

14. INSTRUCTIONS, § 159*—*how considered.* Instructions are to be considered as a series, and vagueness of meaning or doubt as to one instruction may be cured by others.

15. APPEAL AND ERROR, § 1543*—*when instruction on credibility of witnesses not reversibly erroneous.* An instruction as to determining the credibility of witnesses whereby the jury were allowed to consider all "the surrounding circumstances appearing on the trial," *held* not reversible error in view of other instructions given.

Appeal from the Circuit Court of Kane county; the Hon. MAZZINI SLUSSER, Judge, presiding. Heard in this court at the April term, 1916. Affirmed. Opinion filed August 10, 1916. *Certiorari* denied by Supreme Court (making opinion final).

JOHN A. RUSSELL, for appellant.

SNAPP, HEISE & SNAPP, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

Miss Ida M. Tindall was a passenger in a sleeping car on a Chicago & Northwestern Railway train from Duluth to Madison, Wisconsin, and claims that she was there improperly caused and permitted to alight from said car in the nighttime in the yards some distance from the station of the railway company at a place insufficiently lighted and in a place to which she was a stranger and without information how to reach the station, and that in seeking to find her way out she stepped into a depression and was severely jarred. She claims that she was carrying a heavy suit case and that the shoulder of the arm with which she was carrying this suit case was injured, and that said injury became permanent and deprived her of the ability to perform the lucrative employment which she then had. She sued the railway company and the Pullman

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

company. She filed several declarations. There was a jury trial. At the close of the plaintiff's evidence, the jury, by direction of the court, returned a verdict finding the Pullman company not guilty. The case finally went to the jury against the railway company upon an additional count as amended. This count, after suitable allegations charging the operation of the railroad and the relation of carrier and passenger, and the duty of the railway company to its passengers, charged that the company negligently failed to give the plaintiff timely notice of the approach of the train to the station at Madison, and reasonable time to prepare to leave said train and sleeping car at the station with convenience and safety; that plaintiff was therefore unable to leave said train and car at said station and was compelled to remain in said car until it was moved by the railway company from said station at the place appointed for passengers to alight to another part of the yards in the station grounds and detached from said train; and that defendant "negligently permitted and invited plaintiff to alight from said sleeping car at a place which was dark and insufficiently lighted"; and that by reason thereof and through such negligence of defendant, plaintiff, while in the exercise of due care, "was invited, permitted and directed to, and did, alight in the nighttime and while it was dark from the said sleeping car in the yards of said railway company" at a great distance from the station, and that while plaintiff, who was a stranger to the surrounding conditions, was proceeding with due care and caution by the best apparent route from said car in the nighttime in the darkness, over and through the tracks and yards of the company to the station, carrying her hand baggage, she stumbled and fell over some obstacle or into some hole or depression, the precise nature of which, on account of the darkness, is to plaintiff unknown, and she was caused to lurch or was thrown and wrenched or

560    APPELLATE COURTS OF ILLINOIS.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

jerked with great force, and greatly strained, bruised and hurt, and was permanently injured in her body, arm and nervous system, and suffered great pain, and was prevented from attending to her business and affairs, and lost great gains and profits which she otherwise would have acquired. Plaintiff had a verdict for $7,000. Motions by the railroad company for a new trial and in arrest of judgment were denied. Plaintiff had judgment on the verdict, and the railway company prosecutes this appeal.

At the close of all the evidence appellee, by leave of court, amended the additional count so as to state more definitely than before that the place which the count originally said was dark was also insufficiently lighted. Appellant contends in its brief that at the close of the plaintiff's evidence, certain things were said by counsel for the respective parties and by the court concerning this additional count and the charges therein which amounted to a contract by appellee that she would not amend said additional count; and that the amendment so permitted at the close of all the evidence was a violation of that agreement, took appellant by surprise and was reversible error. This position is entirely based upon the statements contained in an affidavit of counsel for appellant contained in between seven and eight printed pages of the abstract. There are two reasons why this affidavit cannot be considered, and a third reason why it cannot prevail: (1) This affidavit is not contained in the bill of exceptions. In a common-law record, affidavits on file can only be brought to the attention of a reviewing court by being embodied in a bill of exceptions. The clerk of the court has no authority to insert in that part of the record kept by him any affidavit or other paper on file, excepting the pleadings and the like which are of themselves a part of a common-law record. The fact that the clerk inserts an affidavit or other paper and certifies that it is on file in the case, or that it was filed on

a certain date, does not make that affidavit or paper a part of the record which the reviewing court can consider. The rule is the same, to a large extent, in chancery. This has been held in a long line of decisions of which the following are examples: *Franey v. True,* 26 Ill. 184; *Schlump v. Reidersdorf,* 28 Ill. 68; *Heacock v. Hosmer,* 109 Ill. 245; *Lange v. Heyer,* 195 Ill. 420; *DuQuoin Water-Works Co. v. Parks,* 207 Ill. 46; *Bellinger v. Barnes,* 223 Ill. 121; *People v. Donaldson,* 255 Ill. 19; *People v. Taxman,* 186 Ill. App. 348. Not only is this affidavit not contained in the bill of exceptions, but the bill of exceptions does not show that at the close of the plaintiff's case or at any other time, any such conversation as is alleged was held between court and the counsel for the respective parties, or that anything was said or done upon the subject of relying upon this additional count as it then stood. The record, therefore, does not present at all the question so elaborately discussed.

(2) If the affidavit had been embodied in the bill of exceptions as a part of the showing made upon the motion for a new trial, it cannot be considered by this court. That which occurred in the presence of the court at the trial cannot be preserved for review by affidavit. What is said and done by the trial judge and what occurs in open court in his presence is within his knowledge and must be recited in a bill of exceptions vouched for by his certificate. If a defeated party could be permitted to make such matters a part of the record by ex parte affidavits, then on a motion for a new trial affidavits might be filed to show what rulings the court made upon the evidence and the instructions. If a trial judge does not remember what occurred he may refresh his recollection by having the notes of the reporter read to him, or by recalling witnesses or jurors, or he may, of his own volition, receive affidavits; but when his recollection has been refreshed it is he

who must certify to the facts, and such facts can only be reviewed upon his certificate as to what occurred. If after the filing of such an affidavit for a new trial the court denies the motion, it will be presumed in support of the action of the court that the trial judge knew that the statements in the affidavit of what occurred in open court were untrue, or that their effect was obviated by other things which occurred in open court to the knowledge of the trial judge. Among the many cases in which this rule has been announced are *Mayes v. People,* 106 Ill. 306; *Peyton v. Village of Morgan Park,* 172 Ill. 102; *Deel v. Heiligenstein,* 244 Ill. 239; *People v. Strauch,* 247 Ill. 220. The contents of the affidavit referred to in the case last cited more fully appear in the opinion of the Appellate Court in the same case, 153 Ill. App. 544. This bill of exceptions only shows that at the close of all the evidence appellee asked and obtained leave to make the amendment over the objection of appellant. The court does not recite anywhere in the bill of exceptions the things upon which the appellant relies to make it error to permit the amendment.

(3) The statute permits the amendment and appellee had a right to make it. If appellant was thereby taken by surprise and desired to obtain other witnesses from Madison on the subject of light, it should have asked for time to do so, or for a continuance. It is obvious from the evidence in the record that appellant had very thoroughly gone into the subject of the lighting at that station and in its yards. It did not ask for either a postponement or a continuance. This cause was tried in May, 1915. This affidavit was sworn to on July 12, 1915, but was not filed until December 29, 1915. It does not state that appellant found any witnesses whom it would or could have produced if the amendment had been made sooner. It does not name any other witness whom it could produce if the new trial were granted because the amendment was al-

lowed that late. It is obvious that appellant was not deprived of any proof which it could have presented. Moreover, the amendment was but an enlargement of that which was already sufficiently stated in the additional count.

The proofs tend to show the following facts: On the evening of February 5, 1914, appellee left Duluth, Minnesota, on a trip to Lancaster, Wisconsin. Her route required her to change cars at Madison, Wisconsin. She took the Duluth Limited, a train running from Duluth to Chicago through Madison. She had a berth in what was called the Milwaukee sleeper, a car which was to be detached from that train at Madison and proceed from thence to Milwaukee. She gave orders to the porter to call her thirty-five minutes before the train would reach Madison, so that she would have time to dress before the train reached the station. She testified that it usually took her from twenty-five to thirty minutes to dress in a sleeper. The train was due to be at Madison at 4:25 a. m. of February 6th. It reached there two minutes late. The porter called appellee shortly before the train reached the station. His excuse for this was that this Milwaukee sleeper did not immediately leave Madison but remained at that city until about 5:00 a. m., so that after the train reached Madison she had ample time to dress. Appellee knew that this sleeper was to be detached from the Duluth Limited at Madison, but she did not know that it remained so long a time at Madison. It is claimed that on cross-examination she testified that she did know that fact, but an examination of her entire evidence satisfies us that she only means that she learned that fact shortly before she left the car, and after she had dressed. Appellee was evidently angry at the porter for not having called her as directed, and she dressed with haste. According to her evidence the porter was sulky and impertinent in reply to her question

564    APPELLATE COURTS OF ILLINOIS.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

why he did not call her as directed. The day coaches were behind the sleepers, and the Milwaukee was the rear sleeper. The course pursued at Madison customarily and on this occasion was this: After the day passengers had alighted from the day cars an engine was attached to the rear of the train and took the day coaches and the Milwaukee sleeper back into the yards. The train had come in on track two, which was nearest the station. The train was taken north to certain crossovers which are outside of the plat in evidence, and made to cross over tracks three and four, and the sleeper was placed on track five, north of Blount street. The course of the railroad at this station was southwest and northeast. Blair street was southwest of the station, and the station faced it. There was a slight curve in the main tracks at the station. Blount street was the next street north of the station. There were train sheds, called umbrella sheds, which ran from Blair street to Blount street, and ended there. Tracks three, four and five ended northeast of the station. When the Milwaukee sleeper had been placed on track five, the switch engine took the day cars back over the same route and attached them again to the end of the Duluth Limited, which usually left for Chicago about 4:35 a. m., or ten minutes after its arrival. It is said that appellee testified she left the car at 4:30, but an examination of her entire evidence shows that what she means is that it must have been at least 4:30, because she could not possibly have dressed in any shorter time. The train dispatcher's sheet shows that the Duluth Limited left at 4:37 that morning, and the porter testified that it was leaving when appellee got off the sleeper. There was for each track a brick platform rising some twelve or eighteen inches above the track on which the train traveled. There were many electric lights in the roof of each umbrella train shed. These lights were controlled by switches near the station in charge of the night station master. It was his

business and the custom to turn on the lights for a particular platform only just before a train arrived at that platform to discharge passengers. As soon as the train started to leave the station it was the duty and custom to turn off the lights in that train shed. The other train sheds were left unlighted. There were incandescent lights over the various doors of the depot. The lights fronting Blair street could not be seen from track five where the sleeper was, which was northeast of the depot perhaps six hundred feet or more. One witness testified that on that occasion this car was parked forty feet beyond Blount street, others sixty feet, and another one one hundred and sixty feet. The brick platforms extended that far, and there were some lights on iron posts on each platform beyond the train shed, but those lights were also controlled by the same switches referred to. There was a light over the express door, another over the baggage door, and another over the doors to the station that were in the direction where this car was. Those lights were called owl lights, were of sixty candle power, and were only intended to aid persons at the station to find the doors. The waiting room at the station was two stories high and had glass on the side towards where this car was, and it had eight clusters of lights, four of which were left lighted in the nighttime when a train was not there. Appellee had been through Madison on this road before, but not in the nighttime, and she had never been in those yards where this car was parked. When she got off this car the station was southwest of her, the town was to the northwest and the yards extended on to the northeast and east for a long distance, and there were in them many switch lights then burning. One witness said that twenty-five or thirty switch lights were visible from that point. The undisputed proof is that it was a very foggy morning. The porter of the sleeping car testified once that it was unusually dark, and another time that it was not any darker than

usual. Appellee testified that she asked the porter the direction to the depot after she had alighted from the car, and that, so far as she recollects, he made no reply, but instantly got upon the car and went into it and slammed the door. He testified that he pointed to her the direction. She did not know where she was and she did not know in which direction the station was, and she started off towards some lights which she saw, but after going a little ways thought she was wrong and went in another direction and was entirely confused. She saw, a little distance away, an engineer oiling his engine and holding a lighted torch. She determined to go to him and ask her way. Just then he went around to the other side of his engine and thus deprived her of the light of his torch. As she went she stepped into some depression which we believe to have been the depression where the track was below the brick platform. She was carrying a heavy suit case. She carried no trunk in her travels and therefore had in her suit case her wearing apparel, and the books and papers which she used in the business in which she was engaged. She plunged forward several times, but did not fall. Soon thereafter she noticed pain in her shoulder which continued to increase as hereafter stated. The engineer came back to that side of the engine and directed her how to reach the station down the brick platform. She went to the station, asked the ticket agent to whom she should make complaint of the porter, and was directed to another station man on duty, and told him she wanted to complain of the porter for his insolence and for not calling her as directed, and then she went into the ladies' dressing room. This officer says he asked her if she was hurt and that she said no. She denies that she was asked that question or made that answer. She suffered pain while there. She took the train for Lancaster about 8:00 a. m. She did but little at Lancaster on account of the pain she suffered. The next day, which was

February 7th, she went back to Madison, went to a hotel and obtained the address of a lady osteopath and went to her for treatment. She asked to have an examination made to see if her shoulder was not out of joint. She returned to the hotel, walked the floor much of the following night, sent for the housekeeper for relief during the night and did have some appliances to relieve her pain then, and she took the Duluth Limited on the morning of February 8th for Chicago. When she arrived at the depot in Chicago she went to the rest room and complained to the nurse of her suffering and the nurse sent for the company doctor and the company detective and they examined her shoulder and did not find it discolored or inflamed. About the middle of the day she went to Joliet. She had a sister, Alice P. Tindall, who was private secretary to the warden of the Illinois State Penitentiary and who had a room in the woman's prison there. Appellee went to that sister and she sent for Dr. Grant Houston, a practicing physician of Joliet, and by him appellee was thereafter treated for a considerable time. He found a discoloration of the shoulder which reached two-thirds of the way to the elbow, and according to other evidence later reached to the wrist. He found inflammation in the shoulder and took her to a hospital for examination and treatment. The final result was a partial ankylosis of the shoulder joint, which reduced the ability of Miss Tindall to move her arm to twenty-five to thirty per cent. of its normal action. At one time in order to overcome any intentional or unintentional resistance by the patient, Dr. Houston put appellee under an anæsthetic, and then did all that he could do to move the arm, and could produce no greater movement than above stated. One of the examinations was by Dr. Houston and a Dr. Hopkins, a medical man who was there representing appellant. Appellant did not call Dr. Hopkins as a witness. Appellant in its brief here has accused appellee of being a malingerer, but not only

is there no evidence whatever to that effect, but the absence of Dr. Hopkins from the witness stand, without any explanation, deprives that claim of any right to serious consideration.

Appellant called the osteopath, the housekeeper of the hotel at Madison, the man who met appellee in the station that morning, those who met appellee in the Chicago station on the 8th, and in the main they fully corroborated appellee as to the fact that she claimed to be suffering pain in that shoulder. There were some slight discrepancies testified to by them. The osteopath when examined in chief testified that appellee told her that she hurt her shoulder by being jammed against the corner of an omnibus. On cross-examination she admitted that she, herself, had had an experience of that kind and that she very likely repeated the story to appellee that morning. Another of these witnesses had been told by appellee of her being hurt, and it was the recollection of that witness that appellee said she was hurt after she talked with the engineer, whereas appellee testified that it was while she was trying to reach the engineer and after she had seen him. These supposed contradictions by witnesses whose attention was not again directed to the matter for several months did not in the minds of the jury weaken the testimony of appellee, and do not tend to show that the main features of her narrative are untrue.

Appellant contends many times in its brief that there is not a word of testimony to show whether it was the right or the left shoulder of appellee which was injured, and that if it was not the shoulder used by her in her employment hereafter described, then she could not have been seriously injured, and the verdict would be excessive. On slightly examining the evidence on this subject we have found five witnesses who testified that it was her right shoulder and her right arm of which she complained, and some of those wit-

nesses were called by appellant. Appellee testified that she had never received any violent injury, or any injury of any kind to her right arm or her right shoulder, before the accident involved in this case. Appellee also testified that she was right-handed and could not do her work with her left hand. It is manifest that there were references to the arm in the presence of the jury which indicated which arm it was, that could not well be incorporated in the bill of exceptions. For instance, in the presence of the jury appellee held up an arm and showed how far she could raise it, and the jury knew, therefore, whether it was the right or the left arm.

Appellant contends that on the question whether there was sufficient light at the place where appellee was injured, her testimony stands alone, and is disputed by thirteen witnesses called by appellant, and that the jury cannot be permitted to decide in favor of one and against so many other witnesses. We do not find that to be the state of the record. The material question was whether the place was sufficiently lighted at the time that appellee was hurt. Most of the witnesses to whom appellant refers were not at that station that night and did not know what lights were burning and what were turned off at the time in question, and did not know whether a heavy fog was prevailing. They did prove that when all the platform lights were burning, the place was sufficiently lighted in ordinary weather. They did prove that they were familiar with the station and the yards, and had often been through the yards at this place in the nighttime, and knowing where they were and what the proper route to the station was, were able at any time when they were there to see their way with sufficient clearness to avoid injury. Appellee testified there was a heavy fog at that time. No one denies it. Appellee testified that she saw nothing by which she could tell

570   APPELLATE COURTS OF ILLINOIS.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

where the station was or what direction she ought to take. The porter testified that the Duluth Limited was leaving the station as appellee left the car. It was the custom for the station master to turn off the platform lights as soon as passenger trains started. The station master had no recollection when he turned off these lights on this particular night, and the jury might fairly infer that they were turned off as soon as the train started to leave, and that those platform lights were not burning when appellee started to leave the car. If they were not, there were no lights then burning at the station except the owl lights over about four or five doors, not intended to cast any light into the yards at all, and the lights inside the waiting room, and there were twenty-five or thirty switch lights burning in other directions and visible to appellee after she got off the car. After the engineer had directed her where to go to reach the station, she was able to find her way, but there was no preponderance of evidence that at that time, before she obtained that information from the engineer, she could see where to go; nor was there any evidence that the depressions where the tracks were below the sides of the platforms were not in darkness. Between appellee and the station were an iron fence and numerous upright posts supporting the train sheds, and supporting the platform lights when burning. There is no doubt but that appellant did prove by a strong array of testimony that this is a well-built station, and that when all the lights were burning it was exceedingly well lighted; but there is no preponderance of evidence that a woman left in the yards in the nighttime, on a foggy night after the platform lights had all been turned off, could see to leave a car and find her way safely to a station of whose situation she was entirely ignorant. The jury believed appellee.

Appellee was about forty-eight years old when this injury was received. She had been a teacher all her

adult life.   After teaching in various positions in private and public schools mathematics and other studies, she went to perfect herself in the study of art in two eastern institutions, and thereafter became a teacher and demonstrator of art.   The Prang Company publishes, introduces and sells a system of art instruction for the public schools.   Wherever a school board buys the Prang appliances and installs the Prang system, the Prang Company sends a demonstrator to that school, who, upon the blackboard and upon large sheets of paper, instructs the teachers of those schools how to give art lessons to the pupils according to the Prang method.   Appellee became the circuit instructor of the Prang Company for the States of Illinois, Wisconsin and Iowa, at a salary of $140 per month for ten months in the year, and she spent the other two months in conducting a similar art school at the University of Colorado.   Besides the salary of $140 per month she was paid her hotel and traveling expenses, and as she was constantly on the road working for the Prang Company during ten months of the year, she practically received what would be equivalent to her board and lodging besides $140 per month.   Prior to this injury the Prang Company had entered into an agreement to pay her during the next year $166.66 per month besides her traveling expenses and hotel bills for ten months in that year.   This work required the free use of her right arm and shoulder.   After she had received all the benefit she could obtain from medical treatment she found herself entirely unable to do the work on account of this partial ankylosis of her right shoulder, and she was obliged to leave that employment.   She undoubtedly can teach, at much lower wages, portions of the common school system, but she has lost by this injury the entire benefit of the higher training which at considerable time and expense she had obtained in these eastern institutions, and she has lost this lucra-

572 APPELLATE COURTS OF ILLINOIS.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

tive salary and her expenses. While $7,000 is a large sum, yet it is evident that it would not take many years to cover that verdict with the actual pecuniary loss she has sustained by the reduction of her earning power. Besides this, she has suffered much and long continued pain. We are unable to say that the damages are excessive.

The defense proved that a few months before this injury appellee was in a wreck on the Illinois Central Railway, and that she had correspondence with the authorities of that road concerning the injury which she received. Apparently it is sought to create the impression that appellee was engaged in the business of being injured on railways. An examination of all the evidence on that subject shows that she was in a passenger car which was in a wreck; that she received some injury to her back; that she caught a severe cold because the passengers were without heat for many hours in a cold part of the year; but that she did not make a claim against the company; but, on the contrary, the claim agent of the road sought her out persistently and urged her to settle for $100, and that the railroad sent a surgeon, who was a friend of her family and knew her well and had been her family physician, to examine her as far as he could without her knowing that she was under examination, and that she desired not to settle until she found out whether she was seriously injured but did not wish to put the matter in the hands of a lawyer, and finally accepted $125 which the railroad company at last offered. It is obvious that it was the railroad company that sought her persistently to settle with her, and evidently the railroad company feared that she might go to some lawyer and it might prove more serious for it. It was positively proven that there was no injury to her shoulder and arm in that connection. There was nothing to justify the jury in supposing that the injuries of which

she now complains were in any respect attributable to that accident.

At the request of appellee's counsel and over the objection of the appellant, appellee, while a witness, was requested to raise her arm as high as she could, and she did stand up and she did raise her arm. It is contended that this was erroneous. We are of opinion that the ruling of the court in permitting this to be done was sustained by the principles announced and authorities cited in *Springer v. City of Chicago,* 135 Ill. 552; *City of Lanark v. Dougherty,* 153 Ill. 163; *Swift & Co. v. Rutkowski,* 182 Ill. 18; *Chicago Terminal Transfer R. Co. v. Kotoski,* 199 Ill. 383; *Chicago & A. Ry. Co. v. Walker,* 217 Ill. 605, and by several of the Appellate Courts, including this court. In *Prichard v. Moore,* 75 Ill. App. 553, we said: "It was not error for plaintiff while on the witness stand to show to the jury to what extent he could move his arm. That demonstration simply made more plain to the jury that which is usually described in words." We may add that in this case it was also described by witnesses in words.

It is contended that the court erred in admitting testimony as to the amount of Dr. Houston's bill. The matter is not fully set forth in the abstract. The record, page 132, is as follows:

"Mr. Heise: You had no contract with Miss Tindall in regard to your professional services, in advance?

"A. No, sir.

"Q. Do you recollect now how much you charged her?

"A. Yes, sir.

"Q. How much was it?

"Mr. Russell: The question is objected to.

"The Court: Objection sustained.

"Mr. Heise: Was the charge you made the usual, customary and going charge for services of that kind in Joliet?

574   Appellate Courts of Illinois.

Tindall v. Chicago & Northwestern Ry. Co., 200 Ill. App. 556.

"Mr. Russell: The question is objected to.

"The Court: Let him answer.

"(To which ruling of the court, counsel for defendant, the Chicago and North Western Railway Company, then and there duly excepted.)

"A. Forty-one dollars.

"Mr. Russell: I object to the answer, and move that it be stricken out.

"The Court: Motion denied; let it stand.

"(To which ruling of the court, counsel for defendant, the Chicago and North Western Railway Company, then and there duly excepted.)"

Appellee argues that in making up the bill of exceptions, something was accidently omitted which escaped the attention of counsel for appellee before the bill of exceptions was signed. We, however, must accept the bill of exceptions as it reads as being correct, in the absence of any action in the court below to have it corrected. We are of opinion that to the question how much Dr. Houston charged appellee for his services in treating her for this injury, the objection made should have been overruled, under *Schmitt v. Kurrus*, 234 Ill. 578. The answer "Forty-one dollars" to the question whether the charge made was the usual customary and going charge for services of that kind in Joliet was obviously not responsive to the question, but that objection was not made to it nor was the motion to strike it out based upon that ground, but only upon general grounds. If attention had been called to the fact that the answer was not responsive to the last question, it could not have failed to be sustained. That specific objection not having been made when it could have been obviated, the general objection will not avail, as stated in *Rich v. Trustees of Schools*, 158 Ill. 242, and in other cases, followed by *Merchants' & Farmers' State Bank of Sullivan v. Dawdy*, 230 Ill. 199. The answer was, of course, to the first question; and as it must have been obvious to the court that it was not an

answer to the second quesion, but was an answer to the first, the action of the court in permitting the answer to stand may be considered as equivalent to a change of the ruling as to the first question, and holding it competent. In that part of the record above quoted, appellant has no objection which is tenable. The court ruled correctly. The specific objection which would have caused the matter to be corrected was not made. Appellee had a right to prove what the charge was, and that is all that there appears. The seventeenth instruction given at the request of the plaintiff permitted recovery for moneys necessarily expended or become liable for doctors' bills, if any, while being treated for such injuries. Appellant might have raised the question upon the giving of that instruction, but while it has attacked other instructions in its brief and argument, it has not questioned that instruction. The rule is familiar and does not require citing of authorities that any error in the record not argued in the opening brief is thereby waived and cannot be availed of by the appellant. So any error in giving that instruction is waived. We do not feel authorized to reverse the judgment because of this peculiar condition of the bill of exceptions as to the testimony on that subject.

Complaint is made of the ninth instruction given at the request of appellee. It states that it is the duty of a carrier of passengers to keep the platforms used in discharging passengers and all passageways leading to and from said places in a reasonably safe condition for that purpose, and if a violation of that duty entailed injury upon passengers without the fault of the latter, the carrier is answerable in damages. It is not denied but that this is a correct statement of the law, but it is argued that it left the jury in uncertainty as to what the question was on which they were to pass. This instruction did not direct a verdict and the instructions are to be considered as a series. If there

was any possible clouding of the issues under that instruction it was removed by various other instructions given. The issues the jury were to try were stated in instructions given at the request of defendant, Nos. 11, 12 and 13, and others, and the matter of proper light was therein specifically and definitely pointed out. Moreover, in No. 14, given at the request of appellant, reference is made to "acts of negligence" so that the jury could clearly get the idea from that instruction that more than one matter was relied upon as negligence in this case, and appellant cannot complain of that which it procured by its instruction. Complaint is made of the first instruction given for appellee, because in discussing the question of the credibility of witnesses, the jury were allowed by it to consider all "the surrounding circumstances appearing on the trial." This instruction was criticised by us as of doubtful propriety in *Ames v. Thren,* 136 Ill. App. 568. It is taken word for word from *North Chicago St. R. Co. v. Wellner,* 206 Ill. 272, and the instruction is there approved, though these words here complained of were not there discussed. The instruction has been approved by the Appellate Court, first district, in *Hopp v. Chicago City Ry. Co.,* 170 Ill. App. 72. Appellant's fourteenth instruction told the jury that appellee must prove one or more of the acts of negligence charged against the appellant in her declaration by a preponderance of all the evidence in the case, and with that cautionary instruction in the record we are of opinion that we ought not to reverse because of the language above quoted from the first instruction. It is also worthy of note that in the second instruction given at the request of appellee, the expression used was "from all the evidence, facts and circumstances in evidence," showing that the facts and circumstances to which the attention of the jury were called were those appearing in the proof. Complaint is made of the third instruction given at the request of appellee re-

lating to the law where two witnesses testify just oppo-
site to each other on a material point. It is not denied
that this states the law correctly, but it is urged that
there was no condition upon which to predicate such
an instruction, and it is claimed that on the material
questions, the evidence is that of appellee against thir-
teen witnesses on the opposite side. We have disposed
of that contention elsewhere, but this instruction prop-
erly applies to the evidence of appellee and of the por-
ter, who, in certain particulars already mentioned,
testified in contradiction to each other. The instruc-
tion was therefore properly given. We find no reversi-
ble error in the record and the judgment is therefore
affirmed.

*Affirmed.*